In the Matter of the Accounting of GUSTAVUS T. KIRBY et al., as Surviving Trustees under a Trust Agreement Made by ISABELLE C. KIRBY, Deceased, Respondents. ISABELLE C. SILLS et al., Appellants.

Second Department, June 2, 1952.

*Forrest M. Anderson* and *Aileen T. Singer* for appellants.

*John J. Dillon* for respondents.

NOLAN, P. J. This is a proceeding for the judicial settlement of the accounts of the respondents as surviving trustees of two *inter vivos* trusts. Objections to the account were filed by Isabelle C. Sills, the secondary life beneficiary of one of the trusts and contingent beneficiary of one half of the other trust. Stephen R. Sills, the husband of Isabelle C. Sills, who has a contingent interest in the remainder of one trust and in the remainder of one half of the other, joined in the objections. The other living beneficiary, Florence Midgley, the mother of Mrs. Sills, made no objection to the account as filed by the trustees.

The trusts involved in this proceeding were established on February 6, 1925, by Isabelle C. Kirby, the widow of Thomas E. Kirby and mother of Gustavus T. Kirby. On that day Gustavus T. Kirby executed and delivered to his mother as mortgagee three separate bonds and mortgages on certain property on Madison Avenue in the city of New York as follows:

1. A $50,000 bond and second mortgage payable on February 1, 1935,

2. A $110,000 bond and third mortgage payable on February 1, 1935,

3. A $110,000 bond and fourth mortgage, payable in monthly installments of $1,916.66 until the principal should be paid.

The first two mortgages were given to the mother, Isabelle C. Kirby, to enable her to set up a $50,000 trust for her own benefit and the ultimate benefit of her granddaughter Isabelle Midgley, now Sills, and to set up a $110,000 trust for her daughter Florence. The third of the above-mentioned mortgages, in the sum of $110,000, was given for the purpose of affording the donor regular income for herself consisting of the monthly payments of interest and amortization of principal provided for in that mortgage.

Simultaneously with the execution of these mortgages the trust agreement was executed. By this agreement Isabelle C. Kirby, the donor, assigned the $50,000 mortgage and the $110,000 mortgage first above mentioned to Gustavus T. Kirby, Joseph F. Calvert and Richard Ely as trustees in two separate trusts. The income from the $50,000 trust was to be paid to Mrs. Kirby for life and then to her granddaughter Isabelle for life and the remainder was to be paid upon her death to her issue, or in default of issue to the persons designated for that purpose in

her will, or in default of such appointment to the persons entitled to her estate according to the laws of intestacy. Income from the $110,000 mortgage was to be paid to Mrs. Kirby's daughter Florence for life and upon her death the fund was to be divided in half, one half to be added to the Isabelle Midgley trust and the other half to be paid to Florence Midgley's appointees or in default of such appointment to the persons entitled to her estate in intestacy. One of the three trustees named by the donor, Gustavus T. Kirby, was the donor's son and the mortgagor of the mortgages comprising the corpus of the trusts.

None of the three mortgages mentioned above, made by the trustee Kirby to his mother, was ever recorded. The $50,000 mortgage contained the following provision: "SUBJECT to several certain mortgages all held by the MUTUAL LIFE INSURANCE COMPANY OF NEW YORK, aggregating the principal sum of One Million, Three Hundred Twenty-five Thousand ($1,325,000) Dollars, or any renewal or renewals thereof, or mortgages given to replace the same, providing the aggregate of said prior mortgage liens shall not exceed the sum aforesaid." The other mortgages contained similar provisions.

The reason, as testified to by Mr. Kirby, for not recording the mortgages which formed the corpus of the trusts, was so that he would be in a position to raise more money on the property for his own purposes, which he could not do if these mortgages were recorded. Apparently the mortgages had been given by Mr. Kirby to his mother to replace a mortgage on the same property, originally in the sum of $250,000, formerly held by his father, and which, at the time of his father's death, had been reduced to $239,000. That mortgage had not been recorded, and passed to Mr. Kirby's mother, on his father's death, pursuant to the terms of his father's will. When the trusts were created, Mr. Kirby increased his mortgage obligations to his mother from $239,000 to $270,000. Subsequent to the date of the trust agreement, Mr. Kirby, the trustee, increased the first mortgage on the property as follows: In June, 1926, by $300,000, in June, 1928, by $375,000 and in May, 1930, by $500,000, so that the total consolidated mortgage on the property held by the Mutual Life Insurance Company on this last date was $2,500,000. No part of the proceeds of these increases was used to pay or reduce the principal of the mortgages held in trust.

On the death of Isabelle Kirby, in 1926, and pursuant to the terms of her will, the trusts for the benefit of her daughter and granddaughter were increased, so as to make the total

principal value thereof the sum of $203,910.70, and the fourth mortgage in the sum of $110,000, as reduced by payments, came under the control of the trustees.

In 1931, real estate values began to fall and it became then evident that the mortgages forming the corpus of the trusts might become worthless, and Mr. Kirby on his own initiative took steps to rehabilitate these trusts. Being a lawyer, he undoubtedly knew that if the mortgages should be cut off by foreclosure of the consolidated first mortgage of $2,500,000, the trustees might well be compelled to make good the loss to the trusts because of the fact that they had failed to record these mortgages, thus enabling the Mutual Life Insurance Company to increase the amount of its loan, and because of the fact that they had not collected the principal of the trust mortgages from the proceeds of the increased loans to him. Of course, Mr. Kirby's personal interest in securing the additional loans was entirely contrary to the best interests of the trusts, and the evidence shows that the trustees had consented to the nonrecording of the mortgages and the increase in the loans beyond the amount of $1,325,000 existing at the time the trust agreement was signed.

For the purpose of rehabilitating the trusts, Mr. Kirby entered into an agreement with the trustees dated April 26, 1932. This agreement, after acknowledging Mr. Kirby's indebtedness to said trusts in the amount of $203,910.70, stated his desire to secure the surrender of his mortgage securities above referred to, and repeated his request that said mortgages be not recorded. By this agreement Mr. Kirby was to transfer to said trustees the securities listed in a schedule, which was a part of the agreement, and all the stock of the Tanrackin Realty Corporation, a corporation which he had organized and to which he had conveyed land which he owned in Bedford, N. Y. The agreement also provided that upon the completion of this arrangement the trustees would surrender to Mr. Kirby for cancellation his mortgages which they held, and the trustees agreed to pay over to the trustees of a trust created by Mr. Kirby for the benefit of his wife and daughter all proceeds received from the sale of the said securities mentioned in the schedule in excess of $203,910.70 and all income in excess of $10,195.54 per annum.

On December 2, 1935, there was another exchange agreement, between the trustees and Wilhelmine S. Kirby, the wife of Gustavus T. Kirby. By the terms of this agreement thirty-four

acres of the Bedford property held by Tanrackin Realty Corporation were conveyed, for the benefit of the trusts, to a new corporation known as Guard Hill Realty Corporation and released from the lien of a mortgage held by Wilhelmine S. Kirby. The trustees, on their part, transferred the stock of the Tanrackin Realty Corporation which had been transferred to them by the exchange agreement of 1932 to the trust for Mr. Kirby's wife and daughter, and Mrs. Kirby released the Tanrackin Realty Corporation from all claims for loans or advances previously made to that corporation.

At the same time the trustees transferred to the Wilhelmine S. Kirby trust shares of stock of the Sterling Securities and American Radiator and Standard Sanitary Corporations and bonds of the Anglo-Chilean Consolidated Nitrate Corporation, previously turned over to the trustees pursuant to the 1932 agreement.

At this time Mr. Kirby's Madison Avenue property was in the hands of the Mutual Life Insurance Company as mortgagee in possession. In 1938 the consolidated mortgage amounting to $2,500,000 was foreclosed, the property was sold, and the price paid at the foreclosure sale was not sufficient to meet the claims of the mortgagee.

On an accounting by respondents as surviving trustees it has been held, by the order appealed from, that after the withdrawal from the trusts, in 1935, of the securities hereinbefore referred to, there remained in the trusts certain securities and assets valued at $190,778.43, and respondents have been surcharged accordingly for a proportionate share of the difference between $203,910.70 and that amount.

The effect of the order appealed from is to confirm the action of the trustees in accepting in substitution for the original bonds and mortgages the securities transferred under the agreement of 1932, and in transferring to the trust for the benefit of Mr. Kirby's wife and daughter the securities withdrawn in 1935, except insofar as the latter withdrawal resulted in a reduction of the value of the securities retained below the amount for which the trustees were originally accountable.

In our opinion this disposition does not properly appraise the obligations of the trustees and their liability to the beneficiaries of the trusts. The learned Referee has found that the corpus of the trusts as established in 1925 was entirely lost when the first mortgage held by the Mutual Life Insurance Company was foreclosed in 1938, and that this loss was in fact

anticipated as early as April 26, 1932, when the agreement referred to above was made for the purpose of re-establishing the corpus of the original trusts.

Respondents do not seriously question these findings. They have assumed, arguendo, although not so conceding, " that in April, 1932, when the Mutual Life Insurance Company took possession of the property underlying the trust mortgages, the trustees had violated the terms of the trust (although acting in good faith) and that through their fault the trusts had become a complete loss." No other conclusion appears to be possible. We do not doubt, on consideration of the evidence as to the circumstances under which the trusts were created, that the trustees believed that they might properly and safely hold the trust mortgages, unrecorded, and that the principal amount of the consolidated first mortgage could be increased, without impairment of the assets in their hands. However, their obligations must be measured by the terms of the agreement under which they were acting and the provisions of the mortgages which they held. Although the trust agreement contemplated to some extent a position of divided loyalty on Mr. Kirby's part, there is no indication from its provisions that it was intended that he should be free to subordinate the trust mortgages, in disregard of their express provisions, to increased prior liens, or that it was ever contemplated that the property subject to the mortgages might be used for Mr. Kirby's own purposes to the detriment of the beneficiaries of the trusts (cf. *Matter of Hubbell*, 302 N. Y. 246). The trustees may have acted in good faith in the sense that they did what they mistakenly believed they were authorized to do. They were, nevertheless, guilty of a breach of their trust, which resulted in a complete loss of the assets committed to their care. Such being the fact, the trustees, in 1932, became liable to reimburse the trusts to the full extent of the loss incurred through their fault. Concededly, Mr. Kirby promptly recognized and acknowledged his responsibility and attempted to discharge his debt by the agreement of 1932. However, the purported substitution of Mr. Kirby's securities for the trust mortgages, under that agreement, fell far short of discharging the trustees' liability. Having suffered through their fault the complete loss of the assets of the trusts, it was their duty to replace those assets, in cash, or in legal securities of equivalent value, which could have been held for the sole benefit of the beneficiaries of their trusts. Had the loss been paid in cash, and the cash invested, or if the loss had been paid by the absolute transfer of securi-

ties, any increase in value of securities held would have resulted in benefit only to those to whom they owed their fiduciary obligation. The assets of the trust were not so restored. Some of the securities transferred were not of the type in which the trustees were authorized to invest. All of them were transferred under an agreement which provided that the benefit of any increase in value, over and above the principal value of the trusts in 1932, should go, not to the beneficiaries of respondents' trusts, but to trustees of the trust for Mr. Kirby's wife and daughter. This was a situation never contemplated when the trust agreement was made, and again placed the trustees in a position of divided loyalty, as between their own beneficiaries and those of a trust in which Mr. Kirby had a conflicting interest. Apparently to guard against this conflict of interests, as well as to protect the interests of Mr. Kirby's wife and daughter, it was provided in the 1932 agreement that if the assets transferred thereunder should produce *on liquidation* an amount over and above $203,910.70, the excess and unliquidated securities should be transferred to the other trust. While this provision was far from sufficient, since it required the trustees, in determining when to liquidate, to consider interests of strangers to their trusts, it furnished some measure of protection, since it evidently contemplated the full restoration of the trust estate through liquidation, before any securities should be diverted or used for any other purposes. This provision of the agreement was disregarded, however, when in 1935 Mr. Kirby and his cotrustees turned over to the trust for the benefit of Mr. Kirby's wife and daughter, without receiving any payment therefor, and without liquidation of other assets sufficient to rehabilitate the trusts, securities which had substantially increased in value and which should have been liquidated so that the proceeds could be applied to discharge respondents' indebtedness to the trust estates. On this accounting respondents should be surcharged on the basis of the full loss of the trust estate and all interest which would have accrued thereon, except insofar as it may properly be said that their liability has been discharged. Obviously, there was no discharge of this liability until December 2, 1935. Until that date, at least, the trustees simply held the assets transferred by Mr. Kirby to secure to the trust estates payment of the loss which had theretofore been incurred. The trustees, therefore, not having discharged their liability should be surcharged such loss as appellant Isabelle Sills suffered in income by reason of their default. If she had continued to receive interest on her propor-

tionate share of the principal of the trusts from 1932 to 1935, inclusive, she would have received the sum of $14,390.80, or at least that sum would have been credited to her trust interest. Actually there was credited to her account during that period only $12,215.90. The trustees should be surcharged this loss of income in the sum of $2,174.90.

What disposition should be made as to the trustees' account, from 1935 on, depends upon the effect which may be given to the transaction of December 2d, in that year. If the trustees had liquidated the securities in their hands at that time and invested $203,910.70 of the proceeds in securities in which they were authorized to invest, they would not thereafter have been liable for any loss in principal or in income which might have resulted from the fact that the securities in which they invested produced less than 5%, the interest rate of the trust mortgages.

They did not liquidate, however, but in lieu of that procedure, allocated to their trusts certain of the securities in their hands, and released to the trust for Mr. Kirby's wife and daughter what they evidently considered to be the excess over and above the amount for which they were accountable. This allocation appears to have been considered by the trustees, and by other interested parties, as an absolute transfer of the securities retained in the trust, free and clear of any claim of the trustees of the Wilhelmine Kirby trust, and may be considered a discharge of the trustees' liability, insofar as the securities retained meet the test imposed by the trust agreement. The trustees were authorized '' in the investment and reinvestment of any principal or capital of said trust estates, in addition to the investments permitted by the statutes of the State of New York for the investment of trust funds, to invest the same in bonds secured by first mortgages upon improved real estate in the City of New York, or in the capital stock, or in the bonds or other obligations of corporations wherever organized in the United States of established earning power.'' After the agreement of 1935 was carried out, the trustees still held in the trust securities which they valued as follows:

| | |
|---|---|
| $43,000 Atlantic City Sewerage Co. Bonds | $45,365.00 |
| Bond and Mortgage of Gerald H. Coster, Principal reduced to | 38,750.00 |
| 34 acres of land, Bedford, New York | 32,575.14 |
| 120 land shares, Kensico Cemetery | 4,800.00 |
| 3,200 shares Atlantic City Sewerage Co. | 64,000.00 |
| 5,200 shares, Bedford Land Co. | 10,400.00 |

If the trustees had accounted at that time, the beneficiaries would have had the option of accepting the securities retained as proper investments, or of rejecting those which would have constituted improper investments. (*Matter of Pelton,* 264 App. Div. 176, and cases cited; *Matter of Lyall,* 212 App. Div. 417; *King* v. *Talbot,* 40 N. Y. 76.) The record does not disclose any reason why they should not have the same option on this accounting. Appellants have approved the retention of the Atlantic City Sewerage Co. bonds, the land shares in the Kensico Cemetery and the shares of the Atlantic City Sewerage Co., which the Referee has valued at $114,165, and have rejected, as improper investments, the other securities retained. Those securities were properly rejected. With the possible exception of the Coster bond and mortgage, they were investments which the trustees had no authority to make under the trust agreement. The Coster bond and mortgage was owned by Mr. Kirby individually; and in no event should he be permitted to repay his own indebtedness to the trust with such a security, on which a principal loss was eventually sustained, without the consent of the beneficiaries.

Also included as part of the corpus of the trusts was a loan to Florence K. Midgley, the nonobjecting beneficiary, in the sum of $851.52 and an overdraft on her income account of $2,471.63. While such a loan was unauthorized and the advances may have been improper, the Official Referee has found that the objectants ratified and confirmed advances to Mrs. Midgley not exceeding $8,000 and that determination may not be said to be against the weight of the evidence. Moreover, appellants will not be prejudiced by retention of the Midgley loan, as the order appealed from provides that the trusts for the two beneficiaries be administered as separate trusts, allocates specific securities to each, and includes the Midgley loan account as an investment solely of the Midgley trust.

The trustees should be surcharged, therefore, on the basis of the loss of principal as of January 1, 1936, in the sum of $40,414.08, representing the difference between the original corpus of the trust and the value of the securities which appellants have elected to retain, with credits to the trustees of $45,811.33, the net proceeds received upon the liquidation of the improper investments in the Coster Bond and Mortgage and the thirty-four acres of land in Bedford, and of $3,520.29, the amount of cash on hand, loans and advances to the beneficiaries. To this should be added the sum of $160 for two items conceded by respondents to be surcharged. The trustees should also be

surcharged the sum of $500 for a payment to Mr. Ely, one of the trustees, in 1932, in connection with the transfer of securities by Mr. Kirby to the trustees. Since that transfer was necessitated by a breach of duty on the part of the trustees, the expenses involved should be borne by them individually. The total deficiency upon which the principal surcharge should be based is, accordingly, $41,074.08. The interest of appellant Isabelle C. Sills in the trust amounts to 35.287% of the whole. In addition she has a contingent interest in the income from one half of the balance in the event she survives her mother. The surcharge should therefore be computed as follows:

| | |
|---|---|
| 35.287% of $41,074.08 | $14,493.81 |
| One-half balance of $26,580.27 | 13,290.14 |
| | |
| Total principal surcharge | $27,783.95 |

Provision may be made in the order to be entered hereon for the surrender by the trustees, upon payment of said principal surcharge, of the shares of Bedford Land Company still in their hands and allocated to the Sills trust; or they may be credited with the net amount received and applied to the corpus of the trusts, if such securities are liquidated.

Respondents should also be surcharged for the loss of income resulting from their unauthorized acts and the consequent depletion in the corpus of the trusts, based upon a return of 5%, the interest payable on the original trust mortgages, for the period from January 1, 1936, until the corpus shall be restored by the payment of the surcharge of principal. However, appellant Isabelle C. Sills has approved the retention of the Atlantic City Sewerage Company bonds and shares and the land shares in the Kensico Cemetery, and has ratified advances to Mrs. Midgley not exceeding $8,000. The trustees should be credited with the income received from those investments and from the net proceeds realized upon the liquidation of the Coster bond and mortgage and the thirty-four acres of land in Bedford, and should not be liable for a 5% return thereon. The amount of the surcharge for loss of income from 1936 to 1949, computed in accordance with these principles, should be included in the order to be entered hereon; and the final order should provide for a surcharge, similarly computed, for the following years to the date of payment of the principal surcharge.

Other minor objections interposed appear to have merit. The trustees have apparently overlooked in their accounting the

sum of $39.36, collected as bank interest, and should be surcharged $13.89, appellant's proportionate share thereof. They should also be held accountable for commissions on income taken for the year 1941 in the sum of $74.73 (Civ. Prac. Act, § 1548).

The learned Referee has found, on the evidence submitted, that the trustees were not guilty of fraud or bad faith. On the basis of that determination objections with respect to commissions and other matters involved in the accounting have been overruled, and the application to remove respondents as trustees has been denied. The determination that the trustees have acted in good faith is one of fact, and it may not be said as a matter of law that a contrary determination is required.

The order appealed from should be modified on the law and the facts in accordance with the views herein expressed, and as so modified, the order insofar as appealed from should be affirmed, with costs to appellants payable by the trustees personally. The learned Referee's findings of fact, insofar as they are inconsistent herewith, should be reversed.

ADEL, WENZEL and MacCRATE, JJ., concur; SCHMIDT, J., taking no part.

Order, insofar as appealed from, modified on the law and the facts in accordance with opinion, and, as so modified, unanimously affirmed, with costs to appellants, payable by the trustees personally. Findings of fact inconsistent herewith are reversed.

Settle order on notice.

[The opinion has been revised to conform to a corrected decision handed down July 7, 1952, which is hereby printed in full.— REP.]

Amended decision, July 7, 1952.

On the court's own motion, the decision handed down June 2, 1952, and the opinion are amended so as to provide that in computing the surcharge for the loss of income resulting from the trustees' unauthorized acts, for the period beginning January 1, 1936, they should also be credited with the income received from the net proceeds realized upon the liquidation of the Coster bond and mortgage and the thirty-four acres of land in Bedford, and should not be liable for a 5% return thereon. The amount of the surcharge for loss of income, computed under the principles stated in the decision, as here amended, shall be substituted in the order to be entered herein for the sum of $10,136.81 [as formerly] set forth in the opinion.

Present — NOLAN, P. J., ADEL, WENZEL and MacCRATE, JJ.; SCHMIDT, J., taking no part.